## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COVENTRY FIRST LLC, a Delaware Limited Liability Company,<br><br>7111 Valley Green Road<br>Fort Washington, PA 19034<br><br>                 Plaintiff,<br><br>        vs.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY, an insurance company organized under the laws of the State of New York,<br><br>1290 Avenue of the Americas,<br>New York, NY 10104<br><br>               Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

1.    This action arises out of the repeated, intentional, knowing, and unlawful conduct of Defendant AXA Equitable Life Insurance Company ("AXA Equitable") aimed at denying its life insurance customers the fair market value of their insurance policies and interfering with the business of Plaintiff Coventry First LLC ("Coventry First"). Over time, a secondary market has developed in which life insurance policy owners can sell their policies to companies such as Coventry First, which then hold the policies until maturity or resell them to other buyers. This secondary market benefits policy owners, who are able to obtain fair market value for their policies, often far in excess of the value such policy owners would have received through a lapse or surrender of their insurance policies to the insurer. It also benefits the buyers, who may earn a profit when the policies mature or are sold to a downstream purchaser.

2.    AXA Equitable, however, dislikes the secondary market because it cuts into the windfall profits it reaps when a policy owner allows his or her policy to lapse after many years of

making payments. When that happens, AXA Equitable retains the premiums paid since the policy's inception without ever having to honor its commitment to pay a death benefit when the insured dies. To protect its windfall profits and to procure as many policy lapses as possible, AXA Equitable has intentionally and repeatedly disrupted the secondary market, impeded the rights of Coventry First, and violated laws protecting the fair marketplace for insurance policies, including statutes prohibiting fraudulent viatical settlement activities. For example, upon information and belief, on numerous occasions AXA Equitable has knowingly provided false information to Coventry First during Coventry First's evaluation of life insurance policies for potential purchase. This is but one manifestation of the anti-competitive actions AXA Equitable has taken as part of an overall scheme to deprive consumers of an established contractual and fundamental property right. These actions were directed not only at impeding the specific life settlements described below, but also at deterring Coventry First and others from purchasing AXA Equitable policies. As a result of its anti-consumer actions, AXA Equitable has impaired its older policy owners' ability to exercise their right to seek fair market value for their unwanted or unneeded life insurance policies. This suit seeks to hold AXA Equitable to account for its actions and to protect Coventry First from further injury.

## PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff Coventry First LLC is a Delaware limited liability company. Its sole member is Montgomery Capital, Inc., a Delaware corporation with its principal place of business in Pennsylvania. Coventry First is a family-operated company and a leading life settlement provider. Coventry First is authorized or licensed to do business in virtually every life settlement jurisdiction throughout the United States, including Pennsylvania, New Jersey, and Nevada. As such, Coventry First is well known to AXA Equitable and other insurance companies as a provider of life settlements to their policy holders.

4.      Defendant AXA Equitable Life Insurance Company is an insurance company organized under the laws of the State of New York with its principal place of business in New York.

5.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1332(a) because Plaintiff is not a citizen of the state where AXA Equitable has its principal place of business or the state in which AXA Equitable is incorporated, and the amount in controversy exceeds $75,000.  To the extent Coventry First seeks declaratory or injunctive relief, the value of the object of the litigation exceeds $75,000. *See Columbia Gas Transmission Corp. v. Tarbuck*, 62 F.3d 538, 541 (3d Cir. 1995).

6.      This Court has personal jurisdiction over AXA Equitable because it has established continuous, systematic contacts within the Commonwealth of Pennsylvania by conducting business with Pennsylvania residents and maintaining multiple offices throughout the Commonwealth. *See* Pennsylvania Long-Arm Statute, 42 PA. CONS. STAT. ANN. § 5322(a)(1)(i); 42 PA. CONS. STAT. ANN. § 5322(6)(i).  In addition, AXA Equitable has purposefully directed the activities set forth below at Coventry First, a resident of Pennsylvania, and this litigation arises out of and relates to those activities.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) because AXA Equitable resides in this district pursuant to 28 U.S.C. § 1391(c).

## BACKGROUND

### I.      The Secondary Market for Life Insurance Policies

8.      Life insurance is commonly used by businesses, individuals, and families to meet their future financial needs.  The United States Supreme Court has long recognized that "life insurance has become in our days one of the best recognized forms of investment and self-compelled saving." *Grigsby v. Russell*, 222 U.S. 149, 156 (1911).  Life insurance can serve a person's or business's needs in a number of ways.  In some cases, it may be desirable to hold a policy until the death of the insured, when the death benefit becomes available to the beneficiaries.  This, however, may occur many years after the policy is purchased.  In the interim, financial needs and circumstances often change.  For example, loans are repaid, children become adults, key employees retire, estates become smaller, divorces occur, businesses dissolve, estate taxes are reduced or eliminated, income protection is no longer needed, spouses

3

die, or liquidity is desired for some other reason.  When such changes occur, it is frequently in the policy owner's interest to recoup some value from the policy before the insured dies.

9.      Historically, policy owners had two options for disposing of unneeded or unwanted insurance policies:  stop paying premiums and allow the policy to lapse, or surrender the policy to the insurance carrier in exchange for its cash "surrender value"—a sum of money established by the insurer as the sole buyer of the policy—minus a surrender charge.  These options did not provide policy owners with the fair market value of their policies.  When a policy lapses, its owner loses the policy, and all of its accumulated value, without remuneration.  And, the surrender value is usually only three to five percent of the policy's face value.

10.      Life insurance policies, however, are the property of their owners, who have the right to sell their policies for fair market value.  As the Supreme Court of the United States, through Justice Holmes, said:  "So far as reasonable safety permits, it is desirable to give to life policies the ordinary characteristics of property. . . .  To deny the right to sell ... is to diminish appreciably the value of the contract in the owner's hands."[1]

11.      The secondary market provides such a means of realizing a policy's full market value, and a valuable alternative to its lapse or surrender.  The fair market value of insurance often exceeds the surrender value by as much as three to four times.  As such, the secondary market permits policy owners to derive substantial economic value from their life insurance assets during the life of the insured.[2]

12.      The secondary market for life insurance has been recognized by the Securities and Exchange Commission, the National Association of Insurance Commissioners, the National Council of Insurance Legislators, United States Government Accounting Office and the Financial Accounting Standards Board as creating more value for life insurance consumers than is available from the insurance carriers themselves.

---

[1] *Grigsby*, 222 U.S. at 156.

[2] The policy owner often is not the insured.  Many life insurance policies are owned by trusts, corporations, or family members of the insured.

4

13.     State legislatures, courts, and insurance regulators across the country have likewise recognized consumers' rights to sell their unwanted or unneeded insurance policies in the secondary market. Such transactions are commonly known as "life settlements."

14.     Life settlements enable a policy owner to assign ownership of a policy (or an interest in the death benefits thereunder) to a life settlement provider in exchange for a percentage of the policy's face value. In other words, it is the sale of a life insurance policy to a third party. The policy owner sells the policy for a payment that is more than the surrender value offered by the issuing insurance company but less than the death benefit. The life settlement provider may continue to pay premiums and, when the policy matures, collect the death benefit.

15.     Insurers have engaged in numerous tactics to delay, interfere, and prevent life settlement transactions, including but not limited to delaying or failing to provide policy illustrations, policy validations, VOC's, and changes of ownership; delaying paying claims for life settlement transactions; engaging in scare tactics by sending warning letters to policyholders loaded with warnings and concerns about life settlements; and prohibiting their agents and brokers from assisting or even discussing life settlements with policy owners. AXA's providing false information to Coventry First, is simply one manifestation of the carriers' concerted efforts to maintain their windfall profits they receive when a policy lapses.

## II.      AXA Equitable Undermines Life Settlements.

16.     AXA Equitable is one of the largest life insurance companies in the United States. It offers insurance products in all 50 states, Washington DC, and Puerto Rico, and has more than 2 million insurance policies in force. Life insurance policies are sold through affiliates of AXA Equitable, including AXA Advisors and AXA Network, as well as by independent brokers and financial institutions via its wholesale brokerage unit, AXA Distributors. AXA Equitable has about $540 billion under management.

17.     Despite the fact that life settlements benefit consumers, are provided for by law, and have been recognized by AXA Equitable as a legitimate estate planning tool, AXA Equitable

has undertaken efforts to obstruct life settlement transactions—despite the benefit they provide to consumers.

18.     As part of its business model, AXA Equitable—like other life insurers—anticipates that a substantial number of policy owners will forfeit their life insurance policies by allowing them to lapse prior to the insured's death.  As a chief actuary from one major insurance company noted, "companies count on policies to lapse in order to support those that don't . . . . each time a policy lapses, the [insurance] company's gain is much larger than would reasonably be expected. . . .  If the company's original assumption for lapse rates materializes, it only must pay a few persisters, or 'winners.'  The vast majority of policyholders who lapse their policies before death are the 'losers.'  They receive much less at surrender than what any reasonable person would perceive as acceptable value."[3]

19.     When an insured's policy lapses—*i.e.*, does not mature into a claim—AXA Equitable retains the premiums paid to date without any risk that it will have to pay a death benefit to the policy's beneficiaries.  AXA Equitable's "earnings for any period depend in part on the . . . . lapse rates and anticipated surrender charges."[4]  Life settlements frustrate this windfall-profit model because they reduce the incidence of policy lapse.  Unlike many policy owners, life settlement providers and subsequent purchasers buy policies with the intent and capacity to hold them to maturity.

A.     **AXA Equitable Seeks To Identify Life Settlement Transactions.**

20.     AXA Equitable could offer its customers a fair, market-derived value for their policies.  AXA Equitable, however, refuses to provide its policy holders with such an equitable option.  Instead, AXA Equitable has adopted a pattern and practice of identifying potential life settlement transactions and unlawfully frustrating or preventing those transactions.

---

[3] William C. Koenig & Stephen H. Frankel, *Don't Forfeit Nonforfeiture*, BEST'S REVIEW, June 2000.

[4] AXA Equitable Life Insurance Company, Annual Report (Form 10-K), at 1A-4 (March 10, 2010).

21.     The life insurance policies issued by AXA Equitable provide insureds with a contractual right to freely assign their life insurance policies.  For example, AXA Equitable contractually agrees that, "[w]hile the insured person is living, you may change the owner or beneficiary by written notice. . . ."  AXA Equitable also contractually agrees that the insured person "may assign th[eir] policy."

22.     These contractual rights are in addition to Federal and State laws and regulations that permit policy owners to freely assign their insurance policies.

23.     When the owners of policies validly issued by AXA Equitable have no longer needed or wanted their policies, they have tried to exercise these rights to sell them in the secondary market.  AXA Equitable, however, has instituted a scheme to preemptively identify life settlement transactions in order to frustrate them.

24.     When a policy owner seeks to change beneficiaries of a validly issued life insurance policy, AXA Equitable demands that the policy owner state whether any of the named beneficiaries are a life settlement company.  Similarly, when a policy owner seeks to assign or transfer ownership of a life insurance policy, AXA Equitable requires the policy owner to state whether the ownership change is in connection with a life settlement transaction.  AXA Equitable also attempts to identify life settlement transactions by flagging life insurance policies about which AXA Equitable receives requests for policy illustrations to age 100 or other requests from a life settlement provider.

**B.      AXA Equitable Seeks To Prevent Life Settlement Transactions.**

25.     Once AXA Equitable had identified a policy that it believes may be sold in the secondary market, it attempts to delay or prevent the sale.

**1.      AXA Equitable Adopts Policies Aimed at Impeding Life Settlements.**

26.     Upon information and belief, AXA Equitable adopted a policy that expressly prohibits its affiliated financial professionals from participating in any life settlement activity, including life settlement transactions involving the purchase of lawfully originated life insurance policies.

27.   Upon information and belief, AXA Equitable further requires its financial professionals to certify on each life insurance application that neither they nor their clients intend to engage in a life settlement transaction or any other secondary market activity. Upon further information and belief, if it is ever determined that the policy owner contemplated selling the policy in the secondary market at some point in the future, the financial professional is subject to disciplinary action up to and including termination and forfeiture of all compensation.

### 2.   AXA Equitable Illegally Uses Verifications of Coverage to Impede Life Settlements.

28.   To exercise their rights of assignment to Coventry First, an AXA Equitable policy owner authorizes Coventry First to seek from the issuing insurance company various information concerning the policy, including whether the policy is valid and enforceable. This information typically is provided in a verification of coverage ("VOC").

29.   A VOC includes ownership information as well as the status, financial condition, and history of a life insurance policy. VOCs enable Coventry First to confirm such things as the policy number, the insured's name and date of birth, the identity of the policy owner, the policy's maturity date, the death benefit, the policy type (universal, term, variable universal life, survivorship whole life, etc), the existence of any liens, loans or collateral assignments, the cash surrender value of the policy, the account value of the policy, the effective issue date of the policy, whether the policy is contestable,[5] whether the policy has lapsed and been reinstated—thereby starting a new contestability period—and the premiums due. Obtaining the information contained in a VOC typically is the final requirement before Coventry First can purchase a life insurance policy.

---

[5] The contestability period, typically two years, is the timeframe in which an insurance carrier can contest the policy's validity based on most alleged material misrepresentations in the application for insurance, or in the case of a lapse, the reinstatement application. Coventry First has a practice of not purchasing policies that are contestable or that have been in force for less than two years.

8

29.    AXA Equitable is fully aware that life settlement providers, including Coventry First, rely on VOCs for their life settlement transactions. AXA Equitable has discussed with Coventry First the importance of VOCs to Coventry First and Coventry First's reliance on VOCs.

30.    AXA Equitable has an obligation to provide (and a general practice of providing) VOCs and policy information to policy owners or their authorized representatives (*e.g.*, accountants, attorneys, and holders of powers of attorney) who request them. However, despite its awareness that Coventry First holds appropriate powers of attorney, AXA Equitable has provided false VOCs to Coventry First, including false statements regarding whether policies are contestable, and thus outside of Coventry First's purchasing parameters.

31.    AXA Equitable has refused to deem policies incontestable even after AXA Equitable admitted to Coventry First that it had erroneously informed Coventry First that the policies were incontestable.

32.    Upon information and belief, these actions were undertaken intentionally and with knowledge.

33.    Such actions are unlawful and undermine the rights of policy owners to freely assign their life insurance policies to life settlement providers.

34.    The following transactions exemplify AXA Equitable's pattern and practice of unlawful activities.

        **a.    AXA Equitable Unlawfully Undermines the Sale of Policy No. 158,223,556.**

35.    In December 2008, Policy Owner A (an individual residing in New Jersey) expressed an interest to Coventry First in selling AXA Equitable Policy No. 158,223,556.[6] Policy No. 158,223,556 was issued on June 15, 2004 with a net death benefit of $1,000,000. Coventry First had no prior involvement with Policy Owner A or Policy No. 158,223,556.

---

[6] Coventry First has omitted names of insureds and policy owners to preserve their privacy interests. To enable AXA Equitable to identify particular policies (of which it is aware at any rate), Coventry First has provided AXA Equitable with policy numbers.

9

36.     Policy Owner A completed a life settlement application on December 26, 2008. Coventry First requested a VOC for Policy No. 158,223,556 on January 2, 2009. AXA Equitable was required by state law to provide a VOC to Coventry First.

37.     AXA Equitable provided a signed VOC for Policy No. 158,223,556 on January 5, 2009. The VOC was signed by Ronald F. Lambe, Vice President for AXA Equitable. The VOC stated that Policy No. 158,223,556 was not contestable.

38.     Coventry First also requested a copy of Policy Owner A's medical file from AXA Equitable. Philip M. Herr, an AXA Equitable senior case design specialist, informed Coventry First in a January 13, 2009 letter that Policy Owner A's medical information was unavailable because Policy Owner A's coverage had successfully been converted to a permanent life policy. As a result, the medical records provided under Policy Owner A's June 10, 2004 terminated term-life policy—which was subsumed by the new permanent life policy—were unavailable. This notice provided Coventry First with further assurance that Policy No. 158,223,556 was not contestable.

39.     AXA Equitable was fully aware that Coventry First was relying on the foregoing representations in making its decision to purchase Policy No. 158,223,556.   On January 21, 2009, in reliance on the foregoing representations, Coventry First funded the purchase of Policy No. 158,223,556 for an amount exceeding $75,000.  This life settlement was governed by New Jersey law.

40.     On October 29, 2009, some ten months later, AXA Equitable informed Coventry First that Policy No. 158,223,556 was contestable after all, and that the contrary information AXA Equitable previously supplied to Coventry First was false.  AXA Equitable refused to substantiate its claim to Coventry First that Policy No. 158,223,556 was contestable.  Upon information and belief, AXA Equitable took this position to thwart Coventry First's purchase of Policy No. 158,223,556 because AXA Equitable is trying to discourage life settlement companies from buying their policies.

41.    AXA Equitable subsequently has knowingly and intentionally refused to deem Policy No. 158,223,556 incontestable.  Upon information and belief, AXA Equitable did so to thwart Coventry First's purchase of Policy No. 158,223,556 because AXA Equitable is trying to discourage life settlement companies from buying their policies.

**b.     AXA Equitable Unlawfully Undermines the Sale of Policy No. 40,243,939.**

42.    In 2009, Policy Owner B (an individual residing in Nevada) expressed an interest to Coventry First in selling AXA Equitable Policy No. 40,243,939.  Policy No. 40,243,939 was issued on August 31, 1990 with a net death benefit of $2,500,000.  Coventry First had no prior involvement with Policy Owner B or Policy No. 40,243,939.

43.    Policy Owner B completed a life settlement application on March 2, 2009. Coventry First requested a VOC for Policy No. 40,243,939 in March 2009.

44.    AXA Equitable provided a signed VOC for Policy No. 40,243,939 on March 25, 2009.  The VOC was signed by Ronald F. Lambe, Vice President for AXA Equitable.  The VOC stated that Policy No. 40,243,939 was not contestable.    That VOC confirmed an oral representation made by a representative named Jenni from AXA Equitable on March 23, 2009 to Coventry First that Policy No. 40,243,939 was not contestable.

45.    On March 25, 2009, an AXA Equitable representative named Robin confirmed that the VOC received on March 23, 2009 was AXA Equitable's definitive statement regarding the status of the policy.

46.    AXA Equitable was fully aware that Coventry First was relying on the foregoing representations in making its decision to purchase Policy No. 40,243,939.  On April 1, 2009, in reliance on the foregoing representations, Coventry First purchased Policy No. 40,243,939 for an amount exceeding $75,000.  This life settlement was governed by Nevada law.

47.    On October 29, 2009—some seven months later, and the same day it unilaterally declared Policy No. 158,223,556 to be contestable—AXA Equitable informed Coventry First that Policy No. 40,243,939 was likewise contestable and that the contrary information previously

supplied to Coventry First was false. AXA Equitable refused to substantiate to Coventry First its claim that Policy No. 40,243,939 was contestable. Upon information and belief, AXA Equitable took this position to thwart Coventry First's purchase of Policy No. 40,243,939 because AXA Equitable is trying to discourage life settlement companies from buying their policies.

48.    AXA Equitable subsequently has knowingly and intentionally refused to deem Policy No. 40,243,939 incontestable. Upon information and belief, AXA Equitable did so to thwart Coventry First's purchase of Policy No. 40,243,939 because AXA Equitable is trying to discourage life settlement companies from buying their policies.

49.    The foregoing are merely examples of AXA Equitable's pattern of unlawful activities.

## CAUSES OF ACTION

### COUNT I
### (Declaratory Relief for Violation of the Nevada Viatical Settlement Act)

50.    Paragraphs 1-49, above, are incorporated herein.

51.    This Court has the power to declare the rights of the parties under 28 U.S.C. § 2201. The parties have adverse legal interests, the fact set forth above are sufficiently concrete to allow for a conclusive legal judgment, and a declaratory judgment would be useful to the parties.

52.    The Nevada Viatical Settlement Act provides that it is "a category D felony . . . for any person, knowingly or with intent to defraud, to do any of the following acts in order to deprive another of property or for his own pecuniary gain:  [] Present, cause to be presented or prepare with knowledge or belief that it will be presented, false information to . . . a provider . . . of viatical settlements . . . or to conceal information, as part of, in support of or concerning a fact material to:  (a) An application for the issuance of a policy or viatical settlement;  . . . (d) A premium paid on a policy or as a result of an agreement to purchase a viatical settlement; (e) A payment or change of beneficiary or ownership pursuant to a policy or viatical settlement; . . . (g) The solicitation, offer or effectuation of a policy, viatical settlement or agreement to purchase a

viatical settlement; or (h) The issuance of written evidence of a policy, viatical settlement or agreement to purchase a viatical settlement." N.R.S. 688C.450.[7]

53.     In connection with Policy No. 40,243,939, AXA Equitable upon information and belief knowingly and with an intent to defraud, and for the purpose of depriving Coventry First of property (the policy)—and for its own pecuniary gain—provided material, false information to, or concealed material information from, Coventry First, a viatical settlement provider, by providing a VOC, which said Policy No. 40,243,939 was contestable, when in fact it was not (as AXA Equitable previously had asserted).

54.     Coventry First relied in good faith on AXA Equitable's initial VOC in purchasing Policy No. 40,243,939.

55.     Coventry First is entitled to a declaration pursuant to 28 U.S.C. § 2201 that AXA Equitable's effort to improperly contest Policy No. 40,243,939 violates the Viatical Settlement Act and that Policy No. 40,243,939 is valid and enforceable.

**COUNT II**
**(Declaratory Relief for Violation of the New Jersey Viatical Settlements Act)**

56.     Paragraphs 1-55, above, are incorporated herein.

57.     This Court has the power to declare the rights of the parties under 28 U.S.C. § 2201. The parties have adverse legal interests, the fact set forth above are sufficiently concrete to allow for a conclusive legal judgment, and a declaratory judgment would be useful to the parties.

58.     The New Jersey Viatical Settlements Act defines a "fraudulent viatical settlement act" to include "[a]cts or omissions committed by any person who, knowingly or with intent to defraud, for the purpose of depriving another of property or for pecuniary gain, commits, or permits its employees or its agents to engage in acts including: (a) Presenting, causing to be presented or preparing with knowledge or belief that it will be presented to . . . a viatical

---

[7] To the extent that the court determines that Pennsylvania law is applicable, the pertinent provisions of that State's Viatical Settlement Act are materially identical to those of the Nevada Viatical Settlement Act. *See* 40 Pa Stat. § 626.2 (1).

13

settlement provider . . . false material information, or concealing material information, as part of, in support of or concerning a fact material to one or more of the following:  (i) An application for the issuance of a viatical settlement contract or insurance policy; (vii) The solicitation, offer, effectuation or sale of a settlement contract or insurance policy; [or] (viii) The issuance of written evidence of a viatical settlement contract or insurance." N.J. Stat. § 17B:30B-2. Fraudulent viatical settlement acts are prohibited in New Jersey, *see* N.J. Stat. § 17B:30B-12(a), and are punishable by civil penalties of up to $10,000, *see* 17B:30B-13(e), and imprisonment, *see* 17B:30B-13(g).[8]

59.     In connection with Policy No. 158,223,556, AXA Equitable upon information and belief knowingly and with an intent to defraud, and for the purpose of depriving Coventry First of property (the policy)—and for its own pecuniary gain—provided material, false information to, or concealed material information from, Coventry First, a viatical settlement provider, by providing the second VOC, which said Policy No. 158,223,556 was contestable, when in fact it was not (as AXA Equitable previously had asserted).

60.     Coventry First relied in good faith on AXA Equitable's initial VOC in purchasing the policy.

61.     Coventry First is entitled to a declaration pursuant to 28 U.S.C. § 2201 that AXA Equitable's effort to contest Policy No. 158,223,556 violates the Viatical Settlement Act and a declaration that Policy No. 158,223,556 is valid and enforceable.

### COUNT III
### (Declaratory Relief Based on Good Faith Purchaser Status)

62.     Paragraphs 1-61, above, are incorporated herein.

63.     This Court has the power to declare the rights of the parties under 28 U.S.C. § 2201. The parties have adverse legal interests, the fact set forth above are sufficiently concrete

---

[8] To the extent that the court determines that Pennsylvania law is applicable, the pertinent provisions of that State's Viatical Settlement Act are materially identical to those of the New Jersey Viatical Settlement Act. *See* 40 Pa Stat. § 626.2 (1)

14

to allow for a conclusive legal judgment, and a declaratory judgment would be useful to the parties.

64.     To the extent Policy Nos. 158,223,556 and 40,243,939 are in fact contestable, Coventry First had no knowledge of those facts when purchasing these policies.  Nor could or should Coventry First have had such knowledge under any objective standard.  To the contrary, AXA Equitable expressly stated that these policies were not contestable, and Coventry First justifiably relied on those representations in purchasing the policies both of which had been in force for several years.  Coventry First had no reason to believe that either of these policies was subject to a new contestability period.  In all respects, Coventry First was a good faith purchaser for value of Policy Nos. 158,223,556 and 40,243,939.

65.     For the reasons set forth above, Coventry First is entitled to a declaration that it is a good faith purchaser of Policy Nos. 158,223,556 and 40,243,939, and that AXA consequently may not rescind or otherwise contest those policies.

## COUNT IV
### (In the Alternative: Fraud/Intentional Misrepresentation)

66.     Paragraphs 1-65, above, are incorporated herein.

67.     To the extent Policy Nos. 158,223,556 and 40,243,939 are contestable, AXA Equitable, through its representatives and agents, upon information and belief knowingly and intentionally made material, false representations of fact to Coventry First, *i.e.*, that these policies were not contestable, as set forth above.  Upon information and belief, AXA Equitable intended in making these fraudulent statements was to induce Coventry First's reliance, *i.e.*, its purchase of these policies.

68.     Coventry First reasonably relied to its detriment on these fraudulent statements in purchasing these policies.

69.     Coventry First relied on such misrepresentations and was injured thereby.

**COUNT V**
**(In the Alternative: Negligent Misrepresentation)**

70.     Paragraphs 1-69, above, are incorporated herein.

71.     To the extent Policy Nos. 158,223,556 and 40,243,939 are contestable, AXA Equitable, through its representatives and agents, negligently made material, false representations of fact to Coventry First, *i.e.*, that these policies were not contestable, as set forth above.

72.     AXA Equitable knew or should have known that these statements were false, and it failed to exercise reasonable care or competence in obtaining or communicating this information.

73.     Coventry First reasonably relied to its detriment on these false statements in purchasing these policies.

**COUNT VI**
**(In the Alternative: Tortious Interference with Contract)**

74.     Paragraphs 1-73, above, are incorporated herein.

75.     Coventry First entered into a valid contractual relationship with Policy Owner A and Policy Owner B.

76.     AXA Equitable knew that these contracts existed but, as set forth above, intentionally disrupted these contractual relationships by issuing revised VOCs on for policy nos. 158,223,556 and 40,243,939 falsely stating that the policies remain contestable.

77.     Coventry First has been damaged, including in that it has suffered the loss of prospective gain, as a result of AXA's tortious interference with contract.

WHEREFORE, Coventry First respectfully asks the Court to:

1.     Declare that the life insurance Policy Nos. 158,223,556 and 40,243,939, purchased from Policy Owner A and Policy Owner B, are in full force and effect and are not contestable and were not contestable when purchased by Coventry First;

2.     In the alternative, award Coventry First compensatory and punitive damages in excess of $75,000.00 to be proved at trial;

3.   Award Coventry First all costs and interest allowed by law; and

4.   Award Coventry First such other relief as is just and reasonable.


By _____

Riley H. Ross III (Pa. Bar No. 204676 )
TUCKER LAW GROUP
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 1700
Philadelphia, PA 19103
215.875-0609 (p)
215.875-8143 (f)
rross@tlgattorneys.com


WILLIAMS & CONNOLLY LLP
Edward J. Bennett
Grace O. Aduroja
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
ebennett@wc.com

**Attorneys for Coventry First LLC**

Dated:  August 10, 2010